# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 16-1100V
Filed: April 29, 2019

```
* * * * * * * * * * * * * *
KRISTI WEYLAND-TAYLOR,          *      UNPUBLISHED
                                *
              Petitioner,       *
v.                              *      Decision on Attorneys' Fees and Costs;
                                *      Reasonable Basis
SECRETARY OF HEALTH             *
AND HUMAN SERVICES,             *
                                *
              Respondent.       *
* * * * * * * * * * * * * *
```

*Richard Gage, Esq.*, Richard Gage, P.C., Cheyenne, WY, for petitioner.
*Camille Collett, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

**Roth**, Special Master:

      On September 2, 2016, Kristi Weyland-Taylor ("Ms. Weyland-Taylor," or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program.[2] Petitioner alleges that she received an influenza ("flu") vaccination in her left shoulder on October 14, 2013, which resulted in a shoulder injury related to vaccine administration, or "SIRVA." Petition ("Pet."), ECF No. 1. Petitioner now seeks an award of attorneys' fees and costs.

---

[1] Although this Decision has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims's website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id*.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I. Background

**A.     Summary of Relevant Medical Records**

Petitioner's prior medical history was significant for synovitis in her foot, psoriasis, psoriatic arthritis, vitamin D deficiency, unspecified mineral deficiency, back pain, and obesity. Pet. Ex. 3 at 1-2. Petitioner received a flu vaccine on October 14, 2013.[3] Pet. Ex. 1 at 1; Pet. Ex. 3 at 132. Her records indicate, "Injections well tolerated by patient." Pet. Ex. 3 at 132.

On October 30, 2013, petitioner presented to her dermatologist, Dr. Ehst, for follow-up of her psoriasis and psoriatic arthritis. Pet. Ex. 7 at 34. She reported that, since starting Humira 13 months before, her joints were "significantly better" and her joint pain was "about stable" since her last visit. *Id*. Her right ankle was "the most bothersome, but tolerable." *Id*. She complained of nausea ongoing for about three months which had worsened over the past month. *Id*. She was concerned it could be secondary to the Humira but thought her anxiety could also be a contributing factor. *Id*. Upon exam, she did not have warm or swollen joints. *Id*. at 35. It was recommended she follow-up with her primary care physician about her nausea, since it was not a commonly reported side effect of Humira. *Id*.

Petitioner presented to Dr. Zink at Gabriel Park Family Medicine ("Gabriel Park") on January 6, 2014 complaining of sinus pain and congestion, sore throat, and a productive cough "for about a week." Pet. Ex. 3 at 141. She did not have a fever. *Id*. She had tried cough syrup, Mucinex, and saline rinses without relief. *Id*. She reported receiving a flu shot in October. *Id*. She was assessed with "Influenza-like illness" and prescribed fluticasone nasal spray and benzonatate. *Id*. at 143.

On July 8, 2014, petitioner telephoned Gabriel Park and was prescribed fluconazole. Pet. Ex. 3 at 147. The record did not note petitioner's specific complaints.

On July 10, 2014, petitioner presented to Dr. Wojcik complaining of frequent urination and pain while urinating for four days. Pet. Ex. 3 at 153. She had been on Bactrim for three days without improvement. *Id*. Blood was drawn from her left arm; she "tolerated [the] procedure well." *Id*. Petitioner was diagnosed with dysuria, hematuria, glucosuria, and abdominal pain, which was concerning for nephrolithiasis. *Id*. at 157-58. She was prescribed ciprofloxacin and instructed to follow-up as needed. *Id*.

Petitioner returned to Dr. Wojcik on July 14, 2014, for follow-up of her urinary tract infection. Pet. Ex. 3 at 182. She reported nausea occurring "over [the] weekend" which kept her in bed; she also had tingling "all over" and experienced weakness and dizziness when going to the bathroom. *Id*. She had developed lower back pain that morning which she thought was caused by being in bed or on the couch all weekend. *Id*. Petitioner was advised that the nausea was likely a side effect of the ciprofloxacin. *Id*. at 184. Petitioner was instructed to follow-up if she did not improve or if she developed a fever. *Id*.

---

[3] The record did not specify in which arm petitioner received the flu vaccine.

On July 23, 2014, petitioner returned to Dr. Ehst for follow-up of her psoriasis and psoriatic arthritis. Pet. Ex. 7 at 41. She was still having a great response to Humira; her joint pain was stable. *Id*. She was experiencing less than thirty minutes of morning stiffness with no swelling. *Id*.

On August 21, 2014, petitioner presented to Dr. Smits complaining of sore throat, stuffy nose, increased reflux symptoms, and not feeling well for two weeks. Pet. Ex. 3 at 196. She had been feeling dizzy for "the past day or two." *Id*. Fluids and rest were recommended. *Id*. at 197. She was instructed to return if the dizziness continued or worsened. *Id*.

On October 23, 2014, petitioner telephoned Gabriel Park and was prescribed trimethoprim-sulfamethoxazole. Pet. Ex. 3 at 202. The record did not note petitioner's specific complaints.

On November 14, 2014, petitioner presented to Dr. Galeano with painful urination and bladder pain. Pet. Ex. 3 at 209. She reported that she had symptoms a couple of weeks ago and was prescribed three days of Bactrim. *Id*. Blood was drawn from her left arm "without difficulty." *Id*. at 217. She was noted to have "tolerated [the] procedure well." *Id*. She was diagnosed with dysuria and urinary tract infection. *Id*. at 210. She was prescribed fluconazole and macrobid. *Id*. at 211. A flu vaccine was administered by Aziz Murtagic. *Id*. at 217. Petitioner was asked whether she had ever had a serious reaction to the flu vaccine, and responded, "No." *Id*.

On December 1, 2014, petitioner presented to Dr. Wiser with a rash. Pet. Ex. 3 at 226. She had had it for five days; it started with her hands and was "everywhere." *Id*. She felt itchy everywhere but had not taken anything for it. *Id*. She previously had scarlet fever and rheumatic fever. *Id*. She was fatigued and nauseated but denied sore throat, fever, or chills. *Id*. at 228. Blood was drawn from her left arm. *Id*. at 231. She had a negative strep test. *Id*. at 229.

On January 2, 2015, petitioner had a surgery consult with urology. Pet. Ex. 3 at 239.

On January 27, 2015, petitioner presented to Gabriel Park for blood work. Pet. Ex. 3 at 243. Blood was drawn from her left arm "without difficulty." *Id*. She "tolerated [the] procedure well."

On January 28, 2015, petitioner returned to Dr. Ehst for follow-up of her psoriasis and psoriatic arthritis. Pet. Ex. 7 at 48. She reported having many urinary tract infections since starting Humira and was going to see a urologist soon. *Id*. She was having occasional skin flares and she had a few lentigenes on her face. *Id*. at 48-49. Her joint pain was stable. *Id*. at 48. She was to continue with Humira. *Id*. at 49.

On March 30, 2015, petitioner presented to Ruth Christiansen, a physician's assistant, complaining of a sinus headache ongoing for four days and right ear pain which started that day. Pet. Ex. 3 at 246, 251. She was diagnosed with acute sinusitis and prescribed amoxicillin. *Id*. at 252. She received a Tdap vaccine; it was noted that the injection was "well tolerated by patient." *Id*. at 250.

On June 8, 2015, petitioner presented to Dr. Zink with right ear pain, nausea, and dizziness. Pet. Ex. 3 at 262. She also complained of nausea, shakiness, and cold sweats. *Id*. She was diagnosed

with right otitis externa (ear infection) and was prescribed ciprofloxacin and fluconazole. *Id.* at 264.

On June 17, 2015, petitioner presented to Gabriel Park for blood work. Pet. Ex. 3 at 271-72.

On June 25, 2015, petitioner presented to Ms. Christiansen for follow-up of her ear infection. Pet. Ex. 3 at 282. She reported that she finished the ciprofloxacin "a week ago," and her symptoms improved but did not resolve. Id. In the last week, she had decreased hearing, nausea, and loose stool. *Id.* at 282-83. She was diagnosed with otitis externa of right ear and was prescribed augmentin. *Id.* at 284. She was referred to an ENT. *Id.*

On July 17, 2015, petitioner presented to Dr. Brooks complaining of left foot pain which radiated up her foot into her ankle. Pet. Ex. 3 at 297. Petitioner reported left heel pain for the last six to eight weeks which began when she had been walking 7 to 8 miles daily. *Id.* She stated that the pain was getting worse; she had recently began using a cane. *Id.* She was noted to have a history of inflammatory arthritis in multiple joints, including her toes, ankles, and MTP joints. *Id.* An x-ray of her left heel showed a small plantar calcaneal spur but no fractures. *Id.* at 298, 303. She was diagnosed with a plantar calcaneal spur and was prescribed a walking boot for two weeks. *Id.* at 298.

On July 29, 2015, petitioner presented to Dr. Wojcik with chest pain and nausea. Pet. Ex. 3 at 329. She reported that a couple of hours before, she had a sharp stabbing pain on the left side of her chest which lasted for about 20 seconds. *Id.* This pain had occurred eight times; it was not triggered by activity or stress. *Id.* She was not having shortness of breath, dizziness, or palpitations. *Id.* For the past couple of days, she had nausea when she was hungry and when she ate. *Id.* She reported having stomach pain after eating fatty or fried food. *Id.* She was not eating healthy but walking two to three miles per day. *Id.* She had blood drawn from her right arm. *Id.* at 329. A cardiac CT showed no evidence of coronary artery calcification. *Id.* at 351. An ECG[4] was normal. *Id.* at 333. An ultrasound showed a normal gallbladder with no evidence for cholelithiasis. *Id.* at 344. The differential diagnosis included gallbladder disease, peptic ulcer disease, anxiety, and musculoskeletal pain. *Id.* at 333. She was prescribed aspirin and advised to seek emergency care if she developed further chest pain or shortness of breath. *Id.* at 334.

Petitioner returned to Dr. Wojcik on August 13, 2015, for evaluation of her test results. Pet. Ex. 3 at 370. She had not had any chest pain, palpitations, or dizziness. *Id.* She was walking 5 miles every day. *Id.* She was eating healthy and keeping a 1300 calorie diet. *Id.* Her test results showed elevated LDL cholesterol. *Id.* at 374. She was diagnosed with dyslipidemia and advised to lose weight. *Id.* at 376. She was also noted to have fatty liver disease and a vitamin D deficiency. *Id.*

On September 10, 2015, petitioner telephoned Gabriel Park, requesting an urgent visit for

---

[4] "ECG" stands for electrocardiogram, a test that measures electrical activity in the heart. It is also abbreviated "EKG." *ECG*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 588 (32d ed. 2012) [hereinafter "DORLAND'S"]; *electrocardiogram*, DORLAND'S at 599.

a urinary tract infection. Pet. Ex. 3 at 390. She was noted to have a vitamin D deficiency. *Id.* at 386. She was prescribed ergocalciferol, Macrobid, and fluconazole. *Id.* at 390.

On October 29, 2015, petitioner telephoned Gabriel Park for certification of her disability papers. Pet. Ex. 3 at 392. On her disability application, she noted that she "can walk only for 1 hour, unable to lift, cannot sit too long in one position." *Id.* at 396.

On December 1, 2015, she presented to Dr. Wojcik with nausea. Pet. Ex. 3 at 402. She reported that she had been having issues with nausea for a while, but it had gotten worse during the past month. *Id.* The nausea was not associated with vomiting or with a particular food. *Id.* It was accompanied by bloating and pressure on the right side. *Id.* She was not having chest pain or shortness of breath. *Id.* A pregnancy test was negative. *Id.* at 412. She was suspected to have new onset cholelithiasis/cholecystitis or nonalcoholic steatohepatitis. *Id.* at 409. She was prescribed ondansetron. *Id.* at 401. She received a flu vaccine. *Id.* She denied past serious reaction to any flu vaccine. *Id.*

On December 7, 2015, petitioner presented with right upper quadrant pain, left lower quadrant pain, and nausea. Pet. Ex. 3 at 434. A CT of her abdomen and pelvis was unremarkable. *Id.* at 412-14. A hepatobiliary scan showed a slightly decreased gallbladder ejection fraction but was otherwise normal. *Id.* at 415. Blood work indicated dyslipidemia. *Id.* at 417.

On December 8, 2015, petitioner telephoned Gabriel Park complaining of right upper quadrant pain. Pet. Ex. 3 at 459-60. She was referred to general surgery. *Id.* at 460.

On March 3, 2016, petitioner telephoned Gabriel Park complaining of nausea. Pet. Ex. 3 at 464. She was referred to gastroenterology. *Id.*

On March 28, 2016, petitioner presented for an upper GI endoscopy. Pet. Ex. 3 at 468. The results were normal. *Id.* at 469. Biopsies of the small bowel and stomach were taken and showed no diagnostic abnormalities. *Id.* at 469, 475 Petitioner was prescribed compazine as needed for nausea. *Id.* at 469.

On April 12, 2016, petitioner had a gastric emptying study. Pet. Ex. 3 at 501. She had delayed gastric emptying with solids; gastric emptying with liquids was barely within limits of normal. *Id.*

On April 14, 2016, petitioner presented to Dr. Wojcik complaining of nausea "almost every day." Pet. Ex. 3 at 513. She reported anxiety and chest pain but denied shortness of breath. *Id.* Her chest pain was thought to be associated with her gastrointestinal symptoms. *Id.* at 520. She was referred to sports medicine for a treadmill EKG. *Id.* She was prescribed omeprazole and recommended to consider future treatment for SIBO. *Id.* at 513.

On June 10, 2016, petitioner presented to Dr. Petering at the Sports Medicine Clinic for a treadmill stress test. Pet. Ex. 3 at 545. She did not have chest pain during the test. *Id.* at 548. Her results indicated physical deconditioning. *Id.*

On June 15, 2016, petitioner had a routine mammogram, which showed benign-appearing calcifications in both breasts. Pet. Ex. 3 at 561.

On June 20, 2016, petitioner presented to Dr. Lahlou complaining of left shoulder pain. Pet. Ex. 3 at 570. Petitioner reported that she received a flu shot "a few years ago," after which her "left shoulder hurt and has gotten worsen and never gotten (sic) better." *Id*. Petitioner reported that moving her arm above her head was painful and the pain was worse when she was active. *Id*. at 570-71. Sometimes it woke her from sleep at night. *Id*. at 571. She denied numbness or tingling in her arm. *Id*. Upon exam, she had a decreased range of motion in her left shoulder but normal strength and no swelling. *Id*. at 572. An x-ray showed no evidence of inflammatory arthropathy in the left shoulder, trace supraspinatus-infraspinatus calcific tendinitis, and mild acromioclavicular joint disease. *Id*. She was assessed with chronic left shoulder pain and left supraspinatus tendinitis. *Id*. She was referred to physical therapy.[5] *Id*. at 573.

On June 21, 2016, petitioner presented to Dr. Deodhar, a rheumatologist, for a follow-up of psoriatic arthritis. Pet. Ex. 8 at 7. Her last visit was in January of 2013. *Id*. She reported pain on the bottom of her left foot, left third and fourth toes and left ankle when bearing weight. *Id*. She also reported pain in her left shoulder due to a rotator cuff injury from two years prior. *Id*. She was interested in changing from Humira to a new medication because her joint pain had not completely resolved on Humira. *Id*. Dr. Deodhar recommended that petitioner continue on Humira and asked petitioner to return for annual follow-ups. *Id*. at 11.

On August 2, 2016, petitioner telephoned Gabriel Park complaining of pain with urination and urinary frequency and urgency. Pet. Ex. 3 at 592. She requested antibiotics. *Id*. She was prescribed Diflucan and Macrobid. *Id*.

On August 10, 2016, petitioner presented to Dr. Wojcik. She reported having had a urinary tract infection which was treated successfully with Macrobid twice daily for five days, but as soon as she stopped taking the medication, her symptoms relapsed. Pet. Ex. 3 at 599. She was diagnosed with a urinary tract infection and prescribed ciprofloxacin and fluconazole. *Id*. at 605.

## B.     Procedural History

The petition was filed without any accompanying records on September 2, 2016, and initially assigned to the Special Processing Unit ("SPU"). ECF Nos. 1, 3. Petitioner was ordered to file medical records and a Statement of Completion by September 12, 2016. *See* SPU Initial Order, ECF No. 4. Petitioner filed a Motion for Extension of Time until November 14, 2016, to file her medical records, which was granted. *See* ECF Nos. 6-7.

Petitioner filed her medical records and a Statement of Completion on November 14, 2016. *See* Petitioner's Exhibits ("Pet. Ex.") 1-3, ECF No. 8; Statement of Completion, ECF No. 9. Pet. Ex. 1 was a screen shot of petitioner's immunization record showing that petitioner received a flu vaccine on October 14, 2013. Pet. Ex. 1 at 1. Pet. Ex. 2 was an iPad screen shot of the record for petitioner's visit with Dr. Rita Lahlou three years later, on June 20, 2016, when she complained of

---

[5] No physical therapy records or other treatment records for petitioner's left shoulder were filed.

left shoulder pain following a flu shot "a few years ago." Pet. Ex. 2 at 1. Pet. Ex. 3 are petitioner's records from Oregon Health & Science University health system dated October of 2011 to August of 2016. *See generally* Pet. Ex. 3.

During the initial status conference on December 12, 2016, petitioner's counsel represented that he intended to file additional medical records from petitioner's dermatologist and rheumatologist. Scheduling Order at 1, ECF No. 10. Petitioner's counsel was ordered to file a narrative affidavit from petitioner detailing the period between vaccination and her first report of shoulder pain. *Id*. Petitioner's counsel advised that petitioner did not pursue the recommended physical therapy ordered on June 20, 2016. *Id*. Therefore, there were no physical therapy records. *Id*. Petitioner's counsel advised that he would like to wait until further records had been obtained before deciding whether to file an amended petition. *Id*. The Court set a deadline of February 13, 2017, for petitioner to file additional medical records and an affidavit. *Id*. at 2.

Four months after the filing of the petition, on January 19, 2017, petitioner filed affidavits from herself, her husband, and her mother, and dermatology records. Pet. Ex. 4-8, ECF No. 11. Petitioner affirmed that her shoulder began hurting "immediately" after receiving the vaccination on October 14, 2013. She stated, "This pain in my shoulder persisted and I also began to experience decreased range of motion in my left shoulder." Pet. Ex. 4 at 1. Petitioner filed a Statement of Completion on February 13, 2017. ECF No. 12. A deadline was set for respondent to file a status report indicating how he intended to proceed by April 17, 2017. Scheduling Order at 1, ECF No. 13.

On April 13, 2017, respondent filed a status report ("Resp. S.R.") requesting a deadline of May 30, 2017, to file his Rule 4(c) Report. Resp. S.R. at 1, ECF No. 14. This deadline was set. ECF No. 15.

Respondent filed his Rule 4(c) Report ("Resp. Rpt.")  on May 30, 2017, recommending against compensation. Resp. Rpt. at 1, ECF No. 18. Respondent noted that petitioner did not allege a Table injury, but even if she had, her injury would not fit the Table criteria. *Id*. at 7. Respondent pointed out that there was no mention of shoulder pain in the medical records until June 20, 2016, two years and 8 months after petitioner received the allegedly causal flu vaccine. *Id*. at 9. Respondent further noted that, when asked by a medical provider, petitioner denied ever having an adverse reaction to vaccination. *Id*. at 8.

This matter was reassigned to me on June 7, 2017. ECF No. 19.

During a status conference on September 12, 2017, petitioner's counsel advised that petitioner was trying to locate the doctor who she consulted for her shoulder pain. Scheduling Order at 1, ECF No. 21. Petitioner's counsel hoped that the doctor would author an affidavit. *Id*. Petitioner was ordered to file either the doctor's affidavit or a status report by November 13, 2017. *Id*.

On November 13, 2017, petitioner filed a second affidavit from her husband along with affidavits from Dr. Cezary Wojcik, Hollie Weimer, and Aziz Muratagic. Pet. Ex. 9-12, ECF No. 22. Dr. Wojcik affirmed that petitioner had mentioned her shoulder pain to him in the past, but he

had never addressed it himself. Pet. Ex. 10 at 1. He did not designate a time frame. Ms. Weimer, one of Mr. Taylor's co-workers at Gabriel Park, affirmed that petitioner presented to a sports medicine fellow for shoulder pain in 2014. Pet. Ex. 11 at 1. There is no indication of when in 2014 that occurred or for which shoulder. Ms. Weimer affirmed that, as the medical assistant to Dr. Edwards, she recalled Mr. Taylor asking Dr. Edwards to examine petitioner's shoulder. *Id.* Ms. Weimer further affirmed that Mr. Taylor had mentioned petitioner's shoulder "a couple of times over the years and how it resulted from a flu shot." *Id.* Mr. Muratagic affirmed that, as a medical assistant at Gabriel Park, he administered petitioner's last three flu shots, beginning with the flu shot she received in December of 2015. Pet. Ex. 12 at 1. Mr. Muratagic further affirmed that petitioner "has always mentioned the injury in her left shoulder that she sustained in 2013 following the flu shot" and that he gives petitioner the flu shot "in her injured arm to ensure her good arm does not get injured." *Id.*

Respondent was ordered to file a status report by January 5, 2018, indicating how he intended to proceed. Non-PDF Order, issued Nov. 14, 2017.

On January 5, 2018, respondent filed a status report advising that he intended to continue defending this case. ECF No. 23.

On January 11, 2018, an order was issued scheduling a status conference for March 13, 2018, at 11:00 am. Non-PDF Order, issued Jan. 11, 2018. Petitioner's counsel failed to appear at this conference. The status conference was rescheduled for April 5, 2018.[6] Informal Communication, Mar. 16, 2018. On March 19, 2018, petitioner filed an Amended Petition, alleging that "she suffered a 'SIRVA' injury in her left shoulder within the time set forth in the Vaccine Injury Table…." Am. Pet. at 2, ECF No. 24.

During the next status conference on April 5, 2018, I noted that, after receiving the influenza vaccine on October 14, 2013, petitioner was seen twenty-six times by her treating physicians over a two-and-a-half-year period following the vaccination, but she never mentioned her shoulder injury, despite complaining of other orthopedic-related symptoms. Scheduling Order at 1, ECF No. 25. Petitioner's counsel represented that petitioner was treated "off the record" for her shoulder injury following her vaccine by her husband's co-worker and was examined by Dr. Jordan Edwards at her husband's place of employment. *Id.* Petitioner's husband reached out to Dr. Edwards, who did not want to get involved. *Id.* Petitioner's counsel then asked for a fact hearing to present testimony from individuals who had submitted affidavits in this matter. *Id.* I advised counsel that, because none of the affidavits submitted were from individuals who claimed to have treated petitioner "off the record," a fact hearing would not resolve the problem that petitioner's first documented complaint of shoulder pain was on June 20, 2016, and at that time she reported onset as 2014 rather than 2013. *Id.* I suggested that petitioner's counsel contact Dr. Edwards and any other individuals who provided "off the record" treatment to petitioner so that they could testify at a hearing regarding that treatment. *Id.* Petitioner was ordered to file a Status Report identifying any medical provider who provided "off the record" treatment to petitioner during that two-and-a-half-year period as well as a mutually agreed upon date for a fact hearing in June or July of 2019 by no later than June 4, 2018. *Id.* at 2.

---

[6] Counsel apologized, stating that his office failed to properly calendar the conference.

Petitioner failed to file a Status Report by the deadline of June 4, 2018. My law clerk sent email reminders to petitioner's counsel on June 5, 2018, and June 8, 2018. Petitioner's counsel did not respond to the emails. On June 18, 2018, I issued an Order to Show Cause, requiring petitioner to file a status report or otherwise show cause as to why this case should not be dismissed for failure to prosecute and failure to follow Court orders by no later than Monday, July 16, 2018. Order to Show Cause at 2, ECF No. 26. Petitioner was advised that failure to respond to this Order would result in the immediate dismissal of her claim. *Id*. Petitioner failed respond to the Order to Show Cause.

A Decision was issued on July 17, 2018, dismissing the petition for failure to prosecute and failure to follow Court orders. ECF No. 27.

On February 14, 2019, petitioner filed a Motion for Attorneys' Fees and Costs. Motion for Fees, ECF No. 31. Petitioner requested attorneys' fees in the amount of $5,984.30, and attorneys' costs in the amount of $863.89, for a total amount of $6,848.19. *Id*. at 4. Petitioner's counsel advised that he was unable to contact petitioner regarding her costs but affirmed that petitioner did not incur any out-of-pocket expenses. *Id*. at 38.

On February 28, 2019, respondent filed a response to petitioner's Motion for Fees, raising reasonable basis. Response, ECF No.32.

Petitioner filed an untimely reply on March 13, 2019. Reply, ECF No. 33. A supplement was filed on April 23, 2019, containing a page of the billing records that had been missing from his original filing. ECF No. 34.

This matter is now ripe for decision.

## II. Applicable Law and Analysis

### A.    Good Faith and Reasonable Basis

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petitioner succeeds on the merits of his or her claim, he or she is entitled to an award of reasonable attorneys' fees and costs. *Id.*; *see Sebelius v. Cloer*, 133 S. Ct. 1886, 1891 (2013). However, a petitioner need not prevail on entitlement to receive a fee award as long as the petition was brought in "good faith" and there was a "reasonable basis" for the claim to proceed. § 15(e)(1).

Good faith is a subjective inquiry that questions whether petitioner's counsel exercised adept professional judgment in determining whether a petitioner may be entitled to compensation. *Chuisano v. United States*, 116 Fed. Cl. 276, 286 (2014) (citations omitted). In the absence of a showing of bad faith, petitioners in the Vaccine Program are "entitled to a presumption of good faith." *Grice v. Sec'y of Health & Human Servs*., 36 Fed. Cl. 114, 121 (1996).

Reasonable basis is an objective standard determined by evaluating the sufficiency of the medical records in petitioner's possession at the time the claim is filed. "Special masters have

historically been quite generous in finding reasonable basis for petitions." *Turpin v. Sec'y of Health & Human Servs.*, No. 99-564, 2005 WL 1026714 at \*2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005).

The Federal Circuit recently denied an award of attorney's fees based on petitioner's lack of reasonable basis in *Simmons v. Secretary of Health and Human Services.* 875 F.3d 632, 636 (Fed. Cir. 2017). In *Simmons*, the Federal Circuit determined that petitioner lacked reasonable basis for filing a claim when, at the time of filing: (1) petitioner's counsel failed to file proof of vaccination, (2) there was no evidence of a diagnosis or persistent injury allegedly related to a vaccine in petitioner's medical records, and (3) the petitioner had disappeared for approximately two years prior to the filing of the petition and only resurfaced shortly before the statute of limitations deadline on his claim expired. *See id.* at 634-35. The Federal Circuit specifically stated that the reasonable basis inquiry is objective and unrelated to counsel's conduct prior to filing a claim. The Court consequently affirmed the lower court's holding that petitioner's counsel lacked reasonable basis in filing this claim based on the insufficiency of petitioner's medical records and proof of vaccination at the time the petition was filed. *Id.* at 636.

In light of *Simmons*, the Court of Federal Claims determined, "[I]n deciding reasonable basis[,] the Special Master needs to focus on the requirements for the petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery. . . Under the objective standard articulated in *Simmons*, the Special Master should have limited her review to the claim alleged in the petition to determine if it was feasible based on the materials submitted." *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121 at \*7 (Fed. Cl. 2018). When evaluating a case's reasonable basis, petitioner's "burden [in demonstrating reasonable basis] has been satisfied . . . where a petitioner has submitted a sworn statement, medical records, and [a] VAERS report which show that recovery is feasible." *Id.* In determining reasonable basis, a special master may not consider the statutory limitations deadline or the conduct of counsel but may consider various objective factors including "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018).

In his Response, respondent submitted, "Here, petitioner failed to establish a reasonable basis for her claim, and thus is legally precluded from receiving even a discretionary award of fees and costs." Response at 5. Respondent pointed out that "the filed medical records are silent with respect to *any* mention of a shoulder injury" and therefore petitioner's claim is not supported by medical records or medical opinion. *Id*. at 4-5 (emphasis in original).

Petitioner submitted that the witness affidavits filed in this matter provide "objective support" for petitioner's claim. Reply at 1. Petitioner further submitted that the petition alleged an on-Table SIRVA claim, and therefore, the "crucial question was whether Petitioner did, in fact, suffer a shoulder injury as a result of a vaccination." *Id*. at 2. Petitioner admitted that "there are no medical records to support her claim" but argued that the affidavits provided sufficient evidence for this claim to be feasible. *Id*. at 2-3.

Reasonable basis "looks not at the likelihood of success" but rather "the feasibility of the claim." *Chuisano*, 116 Fed. Cl. at 286. A claim can have reasonable basis "even if medical records are not filed simultaneously with the petition." *McKellar*, 101 Fed. Cl. 297, 303 (2011). The

reasonable basis inquiry is "broad enough to encompass any material submitted in support of the claim at *any* time in the proceeding, whether with the petition or later." *Chuisano*, 116 Fed. Cl. at 287 (emphasis added). Petitioner alleged a shoulder injury occurring within 48 hours of receiving a flu vaccination – an on-Table injury. *See* 42 C.F.R. § 100.3(a)(XIV)(B). She later filed medical records indicating that she complained to a physician of shoulder pain caused by a flu vaccination. Pet. Ex. 3 at 570-72; Pet. Ex. 8 at 7. Petitioner and her husband submitted affidavits explaining that Mr. Taylor works at a medical facility where petitioner received treatment off the record and that one of the doctors examined her shoulder. *See* Pet. Ex. 4-5. During a status conference on April 5, 2018, petitioner's counsel advised that the physician who provided petitioner's off the record treatment preferred not to be involved in this matter. Petitioner was ordered to file a status report providing the names of any individuals who actually provided off the record treatment for petitioner's alleged shoulder injury by June 4, 2018. Petitioner failed to meet this deadline and did not respond to the Order to Show Cause that was issued after the deadline passed.

Petitioner and her husband submitted only that she received off the record treatment. Petitioner provided no details of the treatment she received, what kind of medical professional provided treatment, what was involved in the treatment she received, or how long she was in treatment, despite being given the opportunity to substantiate her claim. This lack of detail compared with petitioner's medical records and the amount of detail she would provide at medical visits raised issues regarding the credibility of the "off the record treatment." Had petitioner provided detailed information of her off the record treatment either in her affidavit or in the affidavit of the individual who provided that treatment, her claims may have been substantiated. However, petitioner failed to provide any details upon which this assessment could be made. Based on the foregoing, I find that reasonable basis for this claim ended when petitioner could not substantiate the off the record treatment for her alleged shoulder injury. This occurred when petitioner failed to file a status report providing the names of the individuals who rendered off the record treatment and a mutually agreed upon date for a fact hearing for the testimony of those individuals by June 4, 2018. Accordingly, reasonable basis for this claim ended on June 4, 2018.

**B.     Reasonable Hourly Rate**

A "reasonable hourly rate" is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of petitioner's attorney." *Rodriguez v. Sec'y of Health & Human Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349). There is a "limited exception" that provides for attorneys' fees to be awarded at local hourly rates when "the bulk of the attorney's work is done outside the forum jurisdiction" and "there is a very significant difference" between the local hourly rate and forum hourly rate. *Id.* This is known as the *Davis County* exception. *Hall v. Sec'y of Health & Human Servs.*, 640 F.3d 1351, 1353 (2011) (citing *Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. EPA*, 169 F.3d 755, 758 (D.C. Cir. 1999)).

Petitioner has requested hourly rates for Richard Gage of $311 for work performed in 2016, $318 for work performed in 2017, $326 for work performed in 2018, and $338 for work performed in 2019, and an hourly rate for Kristen Blume of $251 for work performed in 2018. These rates

are consistent with rates previously awarded to these attorneys. *Hendrickson v. Sec'y of Health & Human Servs.*, No. 15-812V, 2018 WL 6822351, at \*7 (Fed. Cl. Spec. Mstr. Nov. 26, 2018) (Finding appropriate hourly rates for Mr. Gage); *Desai v. Sec'y of Health & Human Servs.*, No. 14-811V, 2018 WL 6819551, at \*6 (Fed. Cl. Spec. Mstr. Nov. 27, 2018) (Awarding an hourly rate of $251 to Kristen Blume for work performed from 2017 to 2018). Accordingly, I find the requested rates reasonable.

Petitioner has requested an hourly rate of $120 for paralegals Brian Vance and Susan McNair for work performed from 2016 through 2019, which is consistent with previously awarded hourly rates for Mr. Gage's paralegals. *See Desai*, 2018 WL 6819551, at \*6. Accordingly, I find the requested rates reasonable.

Because reasonable basis for this claim ended on June 4, 2018, petitioner will not receive attorneys' fees and costs past that date. Accordingly, $1,463.00[7] is deducted from petitioner's requested attorneys' fees.

## C.    Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). "Unreasonably duplicative or excessive billing" includes "an attorney billing for a single task on multiple occasions, multiple attorneys billing for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries." *Raymo v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 691, 703 (2016). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal. *O'Neill v. Sec'y of Health & Human Servs.*, No. 08-243V, 2015 WL 2399211, at \*9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *McCulloch*, 2015 WL 5634323, at \*26. Hours spent traveling are ordinarily compensated at one-half of the normal hourly attorney rate. *See Scott v. Sec'y of Health & Human Servs.*, No. 08-756V, 2014 WL 2885684, at \*3 (Fed. Cl. Spec. Mstr. June 5, 2014) (collecting cases). And "it is inappropriate for counsel to bill time for educating themselves about basic aspects of the Vaccine Program." *Matthews v. Sec'y of Health & Human Servs.*, No 14-1111V, 2016 WL 2853910, at \*2 (Fed. Cl. Spec. Mstr. Apr. 18, 2016). Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton*, 3 F.3d at 1522. In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen*, 102 Fed. Cl. at 728-29 (affirming the Special Master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (same).

---

[7] After June 4, 2018, Mr. Gage billed 1.5 hours at $326 (-$489) and 1 hour at $338 (-$338). Ms. McNair billed 0.9 hours at $120 (-$108). Mr. Vance billed 4.4 hours at $120 (-$528). $489 + $338 + $108 + $528 = $1,463.

Upon review of petitioner's application, the undersigned finds that the billing records contain entries that are "excessive, redundant, or otherwise unnecessary," or are billed at excessive rates for the task. *Saxton*, 3 F.3d at 1521.[8] Despite several warnings from other special masters, Mr. Gage's firm continues to bill for excessive interoffice communication.[9] *See, e.g., Taylor v. Sec'y of Health & Human Servs.*, No. 15-1346V, 2019 WL 1376039, at *4 (Fed. Cl. Spec. Mstr. Mar. 1, 2019); *Mack v. Sec'y of Health & Human Servs.*, No. 15-149V, 2017 WL 5108680, at *5 (Fed. Cl. Spec. Mstr. Sept. 28, 2017). Accordingly, I find that petitioner's attorneys fees should be reduced by 10%, from $4,521.30 to $4,069.17.

**D.     Reasonable Costs**

Petitioner requested a total of $863.89 in attorneys' costs. Motion for Fees, ECF No. 31. The requested costs consist of the $400.00 filing fee, $295.74 in costs associated with obtaining medical records, and $168.15 in copying costs. *Id.* at 28-29. The undersigned finds petitioner's requested costs to be reasonable.

### III. Total Award Summary

Based on the foregoing, the undersigned **awards the total of $4,933.06**,[10] representing reimbursement for attorneys' fees in the amount of $4,069.17 and costs in the amount of $863.89, in the form of a check made payable jointly to petitioner and petitioner's counsel, Richard Gage, Esq. The Clerk of the Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

**s/ Mindy Michaels Roth**
Mindy Michaels Roth
Special Master

---

[8] The following entries are examples and are not exhaustive; they merely provide a sampling.

[9] *See* Motion for Fees, ECF No. 31, at 8, 9 (Mr. Gage, Mr. Vance, and Ms. McNair each billed for "Office meeting, discussion of current status of case and assigned tasks" on April 10, 2017; October 27, 2017; and February 2, 2018).

[10] This amount is intended to cover all legal expenses incurred in this matter. This award encompasses all charges by the attorney against a client, "advanced costs" as well as fees for legal services rendered. Furthermore, § 15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein. *See generally Beck v. Sec'y of Health & Human Servs.*, 924 F.2d 1029 (Fed. Cir. 1991).

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.